# EXHIBIT 1

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Jonathan A. Shapiro (SBN 257199)<br>BAKER BOTTS L.L.P.<br>101 California Street, Suite 3600<br>San Francisco, CA 94111<br>TELEPHONE NO.: (415) 291-6200   FAX NO.: (415) 291-6300<br>ATTORNEY FOR (Name): Plaintiff MabVax Therapeutics Holdings, Inc. | ELECTRONICALLY FILED<br>Superior Court of California,<br>County of San Diego<br>04/08/2019 at 05:20:48 PM<br>Clerk of the Superior Court<br>By Georgia Dixon-Cosby,Deputy Clerk |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO
STREET ADDRESS: 330 West Broadway
MAILING ADDRESS:
CITY AND ZIP CODE: San Diego CA 92101
BRANCH NAME: Central Division

CASE NAME:
MabVax Therapeutics Holdings, Inc. v. Barry Honig, et al.

| CIVIL CASE COVER SHEET | Complex Case Designation | CASE NUMBER: 37-2019-00018398-CU-SL-CTL |
|---|---|---|
| ☑ Unlimited (Amount demanded exceeds $25,000) | ☐ Limited (Amount demanded is $25,000 or less) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402) | JUDGE: Judge Ronald F. Frazier<br>DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☑ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☑ is ☐ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
a. ☑ Large number of separately represented parties
b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. ☐ Substantial amount of documentary evidence
d. ☐ Large number of witnesses
e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought (check all that apply): a. ☑ monetary b. ☑ nonmonetary; declaratory or injunctive relief c. ☑ punitive
4. Number of causes of action (specify): Nine
5. This case ☐ is ☑ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)

Date: April 8, 2019

Jonathan A. Shapiro
(TYPE OR PRINT NAME)                    ▶ (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only. Page 1 of 2

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego
**04/08/2019** at 05:20:46 PM
Clerk of the Superior Court
By Georgia Dixon-Cosby,Deputy Clerk

1   JONATHAN A. SHAPIRO (SBN 257199)
    jonathan.shapiro@bakerbotts.com
2   BAKER BOTTS LLP
    101 California Street, Suite 3600
3   San Francisco, CA  94111
    Telephone:   415.291.6200
4   Facsimile:   415.291.6300

5   Attorneys for Plaintiff
    MABVAX THERAPEUTICS HOLDINGS, INC.
6

7

8                   SUPERIOR COURT OF CALIFORNIA

9                       COUNTY OF SAN DIEGO

10

11   MABVAX THERAPEUTICS HOLDINGS, INC., a        CASE NO.   37-2019-00018398-CU-SL-CTL
     Delaware corporation,
12                                                **COMPLAINT FOR DAMAGES**
                    Plaintiff,
13                                                  1.  **Market Manipulation**
           v.                                       2.  **Unlawful Business Practices**
14                                                  3.  **Fraud**
     BARRY HONIG; JOHN STETSON; MICHAEL             4.  **Fraudulent Concealment**
15   BRAUSER; JOHN O'ROURKE III; PHILLIP FROST;     5.  **Constructive Fraud**
     MARK GROUSSMAN; STEVEN RUBIN; JOHN H.          6.  **Negligent Misrepresentation**
16   FORD; ROBERT PRAG; ROBERT HAAG; ANDREW         7.  **Tortious Interference with Economic**
     HAAG; GRQ CONSULTANTS, INC.; GRQ                   **Advantage**
17   CONSULTANTS, INC. 401K; GRQ CONSULTANTS,       8.  **Breach of Fiduciary Duty**
     INC. ROTH 401K FBO BARRY HONIG; GRQ            9.  **Restitution for Unjust Enrichment**
18   CONSULTANTS, INC. ROTH 401K FBO RENEE
     HONIG; BARRY AND RENEE HONIG CHARITABLE       **JURY TRIAL DEMANDED**
19   FOUNDATION, INC.; SOUTHERN BIOTECH, INC.; HS
     CONTRARIAN INVESTMENTS, LLC; GRANDER
20   HOLDINGS, INC.; GRANDER HOLDINGS INC. 401K;
     AIRY PROPERTIES; 11 EAST AIRY STREET
21   PARTNERSHIP; ATG CAPITAL, LLC; OPKO
     HEALTH, INC.; FROST GAMMA INVESTMENTS
22   TRUST; MELECHDAVID, INC.; MELECHDAVID, INC.
     RETIREMENT PLAN; ALPHA CAPITAL ANSTALT;
23   THE DEL MAR CONSULTING GROUP, INC.; THE
     DEL MAR CONSULTING GROUP, INC. RETIREMENT
24   PLAN TRUST; and  IRTH COMMUNICATIONS, LLC,

25                   Defendants.

26

27

28

COMPLAINT FOR DAMAGES                                        CASE NO.:

Plaintiff MabVax Therapeutics Holdings, Inc. ("MabVax" or "the Company") files this complaint (the "Complaint") against Defendants Barry Honig ("Honig"); John Stetson ("Stetson"); Michael Brauser ("Brauser"); John O'Rourke, III ("O'Rourke"); Phillip Frost ("Frost"); Mark Groussman ("Groussman"); Steven Rubin ("Rubin"); John H. Ford ("Ford"); Robert Prag ("Prag"); Robert Haag; and Andrew Haag (collectively, the "Individual Defendants"); and against a number of entities affiliated with the Individual Defendants: GRQ Consultants, Inc. ("GRQ"); GRQ Consultants, Inc. 401K ("GRQ 401K"); GRQ Consultants, Inc. Roth 401K FBO Barry Honig ("GRQ Roth 401K Honig"); GRQ Consultants, Inc. Roth 401K FBO Renee Honig ("GRQ Roth 401K Renee"); Barry and Renee Honig Charitable Foundation, Inc.; Southern Biotech, Inc. ("Southern Biotech"); HS Contrarian Investments, LLC ("HSCI"); Grander Holdings, Inc. ("Grander"); Grander Holdings Inc. 401K ("Grander 401K"); Airy Properties; 11 East Airy Street Partnership; ATG Capital, LLC ("ATG"); OPKO Health, Inc. ("OPKO"); Frost Gamma Investments Trust ("FGIT"); Melechdavid, Inc. ("Melechdavid"); Melechdavid, Inc. Retirement Plan ("Melechdavid Retirement"); Alpha Capital Anstalt ("Alpha"); The Del Mar Consulting Group, Inc. ("DMCG"); The Del Mar Consulting Group, Inc. Retirement Plan Trust ("DMCG Retirement"); and IRTH Communications, LLC ("IRTH") (collectively, the "Corporate Defendants"; collectively with the Individual Defendants, "Defendants"), and alleges as follows:

## INTRODUCTION

1.      MabVax is a clinical-stage biotechnology company that is developing treatments for certain insidious cancers, including pancreatic cancer, soft tissue cancer, and ovarian cancer. MabVax was founded in San Diego more than a decade ago by leading pharmaceutical researchers, clinicians, and entrepreneurs, including the head of the Laboratory of Tumor Vaccinology at the renowned Memorial Sloan Kettering Cancer Center in New York.  Since then, the MabVax team has brought its promising therapies into clinical trials in conjunction with traditional chemotherapy and collaborated with others here and abroad—including Memorial Sloan Kettering—in the fight to find effective treatments for these diseases.  Along the way, MabVax matured from a local start-up financed by a few generous patrons into a public company with its stock traded on the Nasdaq Stock Market.

COMPLAINT FOR DAMAGES                                          CASE NO.:

2.     The Company's clinical research has been exhausting and expensive.  Like other clinical-stage biotechnology companies, MabVax cannot earn product revenue until it (or its collaborative partners) complete clinical trials, obtain regulatory approval, and successfully commercialize one or more of its products.  As a result, the Company has incurred, and will likely continue to incur, substantial operating losses.  In order to continue its vitally important work, MabVax has raised, and, if it can carry on, will have to continue to raise, money through debt and equity financing.  Unfettered access to the public capital markets has been, therefore, of critical importance to the Company—as are honest transactions in those markets.

3.     In 2014, however, MabVax's promising future was cast into peril, after a group of market manipulators organized by Honig accumulated a controlling position in the Company's stock. Defendants pretended they sought legitimate returns by investing in MabVax's life-saving innovations, but instead defrauded the Company through illicit transactions for their enormous profit to the detriment of MabVax.  It is now clear that, from the get-go, Defendants sought to manipulate the Company—in March 2015, Honig assured Defendants Frost, Brauser, and Stetson that MabVax was a "really good opportunity," and that the group would *"make $35 million conservatively in 4 months and our money out [in] 4 weeks ... "*  And in an April 2015 email, Stetson was explicit that the group was *acting to gain "control of the board"* in ways that they would never disclose as required by the securities laws.  The Defendants concealed their beneficial ownership of MabVax for years in false public SEC filings—and in many instances simply failing to file required ownership reports at all.  As a consequence of Defendants' egregious misconduct, MabVax was, among other things: deceived into issuing Defendants tens of millions of dollars' worth of common stock, cut off from legitimate investors; confronted with an expensive investigation by the U.S. Securities and Exchange Commission ("SEC"); and forced to publicly disclaim reliance on past financial statements that had been rendered inaccurate by Defendants' concealment of their coordinated investment, trading, and manipulation of the Company's stock.  In addition, directly related to Defendants' actions, the Company was delisted from trading on the Nasdaq, thereby strangling its access to the capital markets. The Company now is bankrupt.

-2-

COMPLAINT FOR DAMAGES                                      CASE NO.:

4.      The SEC has recently commenced a federal court enforcement action against the investor group for its illicit control and victimization of MabVax and two other issuers, bringing securities fraud and market manipulation claims against Defendants Honig, Brauser, Stetson, O'Rourke, Groussman, Frost, Ford, Alpha, ATG, FGIT, GRQ, HSCI, Grander, Melechdavid, OPKO, and Southern Biotech. *See Securities and Exchange Commission v. Honig, et al.*, 1:18-cv-08175 (S.D.N.Y.) ("SEC Action"). The SEC has detailed the fraud in a 100-page complaint, which it has described as a "brazen market manipulation" and a "classic pump and dump" in statements reported by the *Wall Street Journal* and other national media.   Some Defendants have already resolved the SEC's richly-detailed complaint. For example, Frost, Groussman, and Alpha have agreed to pay more than $5.6 million, $1.3 million, and $900,000, respectively, on their and their affiliated entities' behalf, and been enjoined by a federal court against any future violations of the securities laws or even any future personal investments in vulnerable smaller public companies like MabVax.

5.      Ultimately, Defendants destroyed this Company—but not before fraudulently inducing it to issue more than 2.6 million shares of common stock (worth roughly $22 million at the time) that the Company would have been prohibited from issuing had the true facts been disclosed; defrauding it out of millions more on vendors—and even lawyers—who were secretly part of the pump and dump scheme orchestrated behind the Company's back; and infecting its capitalization table and alienating legitimate investors to the point that MabVax has been delisted with no prospects for the financing it needs to bring its cancer treatments to market. Further, as conditions of financings, the Company was required by Defendants to issue to Defendants and their affiliates shares of its preferred stock for free as "inducement shares." In total, these "inducement shares" of MabVax stock were convertible into over 2.8 million shares of common stock (worth over $8.3 million at the times of issuance), of which Defendants personally took the great majority. Today, MabVax is down to six employees, is behind on its payment obligations to the Memorial Sloan Kettering Cancer Center in New York, and is now forced to sell off its promising clinical program on a "best offer" basis.

-3-

COMPLAINT FOR DAMAGES                                    CASE NO.:

**THE PARTIES**

6.      Plaintiff MabVax Therapeutics Holdings, Inc. is, and at all times mentioned in the Complaint was, a Delaware corporation, with its principal place of business in San Diego County, California.

**Individual Defendants**

7.      **Honig** is a resident of Boca Raton, Florida and, at all relevant times, worked at an office in Boca Raton with Stetson and O'Rourke, and previously Brauser.  Honig owns GRQ.  Honig also owns a majority stake in HSCI, of which Stetson is the named managing member.  Honig was also the president and one-third owner of Southern Biotech, a now-dissolved Nevada entity.  Honig also is the president of Barry and Renee Honig Charitable Foundation.  Honig also is the trustee of GRQ 401K, and of GRQ Roth 401K Honig, and in such capacity has voting and dispositive power over the securities held by GRQ 401K and GRQ Roth 401K Honig.  The SEC has brought fraud and other securities claims against Honig and affiliated entities GRQ and HSCI in connection with MabVax and other issuers in the SEC Action.

8.      **Brauser** is a resident of Lighthouse Point, Florida.  He owns Grander, is the trustee of Grander 401K, and owned one-third of Southern Biotech.  The SEC has brought fraud and other securities claims against Brauser and Grander in connection with MabVax and other issuers in the SEC Action.

9.      **Stetson** is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and O'Rourke.  Stetson has a minority investment in HSCI, of which he is the named managing member.  The SEC has brought fraud and other securities claims against Stetson in connection with MabVax and other issuers in the SEC Action.

10.     **O'Rourke** is a resident of Fort Lauderdale, Florida and, at all relevant times, worked at an office in Boca Raton with Honig and Stetson.  O'Rourke owns Airy Properties and ATG Capital LLC.  He also controls 11 East Airy Street Partnership through both voting and dispositive power.  The SEC has brought fraud and other securities claims against O'Rourke and ATG in connection with MabVax and other issuers in the SEC Action.

-4-

11.     **Frost** is a resident of Miami Beach, Florida.  Frost founded OPKO, Inc., and is its CEO. Frost is also the trustee for FGIT.  Frost also was the undisclosed one-third owner of Southern Biotech. Frost enjoys a reputation as a successful biotech investor.  The SEC brought fraud and other securities claims against Frost in connection with MabVax and other issuers, which Frost has settled by agreeing to aggregate payments on behalf of himself and his affiliates in excess of $5.6 million, and to entry of a federal court injunction against further violations of the securities laws, and from even investing in smaller public companies like MabVax.

12.     **Groussman** is a resident of Miami Beach, Florida and occasionally works at an office in Boca Raton with Honig, Stetson, and O'Rourke.  Groussman owns Melechdavid and is the trustee of Melechdavid Retirement.   The SEC has brought fraud and other securities claims against Groussman and Melechdavid in connection with MabVax and other issuers, which Groussman has settled on behalf of himself and Melechdavid by agreeing to aggregate payments in excess of $1.3 million, and to entry of a federal court injunction against further violations of the securities laws and from even investing in smaller public companies like MabVax for a period of five years.

13.     **Rubin** is believed to be a resident of Miami, Florida.  He is the Executive Vice President for Administration of OPKO, Inc., as well as a member of its Board of Directors.  Rubin also is an attorney.

14.     **Ford** is a resident of Bolinas, California.   The SEC has brought fraud and other securities claims against Ford in connection with MabVax and other issuers, which Ford has settled by agreeing to pay disgorgement to be determined by a federal court at a later date, and to entry of a federal court injunction against further violations of the securities laws and from even investing in smaller public companies like MabVax.

15.     **Robert Prag** is believed to be a resident of Del Mar, California.  He is the founder, owner, and principal of DMCG, an investor relations firm, located in Del Mar, California, and is the trustee of DMCG Retirement.

16.     **Robert Haag** is believed to be a resident of Santa Monica, California.  He is the Managing Director and Partner of IRTH, located in Santa Monica.

-5-

17.     **Andrew Haag** is believed to be a resident of Santa Monica, California.  He is the Founder and Managing Partner of IRTH, located in Santa Monica.

**Entity Defendants**

18.     **11 East Airy Street Partnership** is a Pennsylvania corporation that O'Rourke controls through both voting and dispositive power.  11 East Airy Street Partnership was incorporated in or around 1984.

19.     **Alpha** is a Lichtenstein corporation and hedge fund, managed by an unregistered investment adviser located in New York, New York.  The SEC has brought fraud and other securities claims against Alpha in connection with MabVax and other issuers, which Alpha has settled by agreeing to aggregate payments in excess of $900,000, to retain an independent compliance counsel, and to entry of a federal court injunction against further violations of the securities laws.

20.     **Airy Properties** is a Pennsylvania corporation that O'Rourke owns and operates.  Airy Properties was incorporated in or around 1972.

21.     **ATG** is a Florida corporation that O'Rourke owns and operates with its principal place of business in Florida.  ATG was incorporated in or around 2012.  The SEC has brought fraud and other securities claims against ATG in connection with MabVax and other issuers in the SEC Action.

22.     **Barry and Renee Honig Charitable Foundation, Inc.** is a Florida not for profit corporation that Honig owns and operates with its principal place of business in Florida.  Barry and Renee Honig Charitable Foundation, Inc. was incorporated in or around 2008.

23.     **DMCG** is a California corporation that Prag owns and operates with its principal place of business in California.  DMCG was incorporated in or around 1999.  Defendants required MabVax to use DMCG for investors relations services.

24.     **DMCG Retirement** is a California trust.  Prag is the trustee of DMCG Retirement.

25.     **FGIT** is a Florida trust that was formed in or around 2002.  Frost is FGIT's Trustee.  The SEC has brought fraud and other securities claims against FGIT in connection with MabVax and other issuers, which FGIT has settled by agreeing to entry of a federal court injunction against further violations of the securities laws and from even investing in smaller public companies like MabVax.

COMPLAINT FOR DAMAGES                                                    CASE NO.:

26.     **Grander** is a Florida corporation that Brauser owns and operates with its principal place of business in Florida. Grander was incorporated in or around 2010. The SEC has brought fraud and other securities claims against Grander in connection with MabVax and other issuers in the SEC Action. Grander received shares of MabVax preferred stock convertible into 26,667 shares of common stock valued $144,000 at the time of issuance as a "co-lead investor" fee in connection with a public offering conducted by an investment bank.

27.     **Grander 401K** is a Florida trust. Brauser is the trustee of Grander 401K.

28.     **GRQ** is a Florida corporation that Honig owns and operates with its principal place of business in Florida. GRQ was incorporated in or around 2004. The SEC has brought fraud and other securities claims against GRQ in connection with MabVax and other issuers in the SEC Action.

29.     **GRQ 401K** is organized in the State of Florida. Honig is GRQ 401K's trustee, and in such capacity has voting and dispositive power over the securities held by GRQ 401K.

30.     **GRQ Roth 401K Honig** is organized in the State of Florida. Honig is GRQ Roth 401K Honig's trustee, and in such capacity has voting and dispositive power over the securities held by GRQ Roth 401K Honig.

31.     **GRQ Roth 401K Renee** is organized in the State of Florida. Honig's wife is GRQ Roth 401K Renee's Trustee.

32.     **HSCI** is a Delaware corporation that Honig and Stetson co-own and of which Stetson is the managing member, with its principal place of business in Florida. HSCI was established in or around 2011. The SEC has brought fraud and other securities claims against HSCI in connection with MabVax and other issuers in the SEC Action. HSCI received MabVax preferred stock, convertible into 70,000 shares of common stock valued $378,000 at the time of issuance as a "co-lead investor" fee in connection with a public offering conducted by an investment bank.

33.     **IRTH** is a Nevada Corporation with its principal place of business in California. Andrew Haag is its founder and managing partner, and Robert Haag is its managing director and partner. Defendants required MabVax to use IRTH for investor relations services as a condition of financing.

-7-

34.   **Melechdavid** is a Florida corporation that Groussman owns and operates with its principal place of business in Florida.  Melechdavid was incorporated in or around 2006.  The SEC has brought fraud and other securities claims against Melechdavid in connection with MabVax and other issuers in the SEC Action, which Melechdavid has settled by agreeing to entry of a federal court injunction against further violations of the securities laws and from even investing in smaller public companies like MabVax for a period of five years.

35.   **Melechdavid Retirement** is a Florida trust.  Groussman is the trustee of Melechdavid Retirement.

36.   **OPKO** is a Delaware corporation.  Its principal place of business is in Florida.  Frost is OPKO's CEO.  OPKO was incorporated in or around 2007.  The SEC brought fraud and other securities claims against OPKO in connection with MabVax and other issuers, which OPKO has settled by agreeing to payment of a $100,000 civil penalty, to establish certain committees of its board of directors to handle its strategic investments for so long as Frost is a director or officer of OPKO, to retain an independent compliance counsel, and to entry of a federal court injunction against further violations of the securities laws, and from even investing in smaller public companies like MabVax for a period of five years.

37.   **Southern Biotech** is a now-dissolved Nevada corporation that Honig operated and co-owned with Brauser and Frost, and managed also by Stetson, with its principal place of business in Florida.  Southern Biotech was incorporated in or around 2014.  The SEC brought fraud and other securities claims against Southern Biotech in connection with MabVax and other issuers in the SEC Action, but has dropped its claims as Southern Biotech was recently dissolved.

38.   MabVax is informed and believes that in doing the wrongful, illegal, tortious, intentional acts hereinafter alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

## JURISDICTION

39.   Jurisdiction and venue are proper because Defendants' wrongful conduct was directed to and caused MabVax injury in the County of San Diego and Defendants' false and misleading

-8-

COMPLAINT FOR DAMAGES                                        CASE NO.:

communications were directed to, received in, and had a significant economic impact in the County of San Diego. Throughout the period relevant to this Complaint, Defendants called, emailed, and met with MabVax in this County, knowing that the Company was headquartered in the County of San Diego and knowing that the effects of their misconduct would be, and were, felt in San Diego.

40.     Among other things, Defendants Honig, Stetson, Brauser, O'Rourke, Groussman, and Prag sent to MabVax in San Diego the fraudulent requests for conversion of convertible preferred stock into common stock that in part form the basis for this action. Since April 2015, the total value of the common stock issued to Defendants and their family members on the dates of conversions amounted to over $22 million, representing nearly 99% of all preferred stock that was converted during that period. Those Defendants, and also Frost, FGIT, and, OPKO, all sent to MabVax in San Diego investor certifications and other documents that fraudulently omitted their true beneficial ownership of the Company's stock.

41.     Honig and Stetson physically came to California to meet with MabVax, including to solicit and negotiate investment in the Company.

42.     At all relevant times, Ford lived in California. As detailed below, unbeknownst to the Company, O'Rourke directed Ford to perform certain fraudulent actions in California, at the behest of other Defendants.

43.     At all relevant times, Prag, Robert Haag, and Andrew Haag lived in California, and DMCG, DMCG Retirement, and IRTH are all California entities. As detailed below these defendants worked in concert with the other defendants as part of Defendants' collective effort to achieve the illicit objectives.

44.     Rubin entered into a purported consulting agreement with MabVax in California, communicated with Company personnel in California, and was issued shares by the Company in California.

## MABVAX IS FRAUDULENTLY INDUCED INTO A RELATIONSHIP WITH DEFENDANTS

45.     By the end of 2013, MabVax was a privately-held company that had been in business for five years and was looking for funding for its research and development efforts in cancer therapies

-9-

and diagnostic products, having reached the point where its committed existing private investors, founders, friends, and family could no longer shoulder the crushing expense of bringing new cancer treatments to market. At the same time, and unbeknownst to MabVax, Honig and his group—who had no relationship with the Company and were not known to its management—were searching for a new public company to victimize for another pump and dump scheme, just as Defendants had orchestrated on *dozens* of prior occasions—including not only the two other issuers that are the subject of the SEC Action, who, on information and belief, are CoCrystal Pharma, Inc. (f/k/a BioZone Pharmaceuticals, Inc.), and MGT Capital Investments, Inc., but also, on information and belief, including Riot Blockchain (f/k/a Bioptix, Inc.),[1] Pershing Gold Corporation (f/k/a Sagebrush Gold, Ltd.; f/k/a The Empire Sports & Entertainment Holding Co.; f/k/a Excel Global, Inc.),[2] and U.S. Gold Corporation (f/k/a Dataram Corporation).[3] Although Honig had already found a publicly-traded shell company that could be purchased inexpensively and then manipulated, Defendants had a major problem: the shell company had no investment-worthy business and, for this reason, they needed to find a promising private company (like MabVax) that could quickly be taken public—through a so-called "reverse merger" with the moribund shell—in order to launch the pump and dump scheme.

46.     In early 2014, Defendants' reverse merger problem was solved by the identification of MabVax with the assistance of a hedge fund and its affiliates with whom Honig and other Defendants frequently collaborated ("Entity H"). Entity H did not have any prior relationship with MabVax. Nor did Entity H directly reach out to MabVax. Instead, MabVax was invited to come to New York to give a presentation about its clinical work to a non-profit charity ("Charity H"), which claimed it wanted to award the Company a much-needed $500,000 grant to research childhood cancer treatment. Charity H scheduled MabVax's presentation to take place at Entity H's offices in midtown Manhattan.

---

[1] Until 2017, Bioptix, Inc. made diagnostic machinery for the biotech industry. In the fall of 2017, Bioptix changed its name to Riot Blockchain, and became a cryptocurrency mining company.
[2] According to its February 5, 2013 S-1/A, Excel Global, Inc., founded in 2007, "operated as a web-based service provider and consulting company." After changing its name to The Empire Sports & Entertainment Holdings Co. in September 2010, the company "commenced the promotion and production of sports and entertainment events as [its] sole line of business." On May 16, 2011, the company changed its name to Sagebrush Gold Ltd., and focused on gold mining. It continued to be a gold mining company when it changed its name to Pershing Gold Corporation in 2012.
[3] Dataram Corporation was a manufacturer of memory products. In June 2017 the company changed its name to U.S. Gold Corporation to reflect its pivot into gold mining.

-10-

47.     MabVax's senior leadership predictably accepted Charity H's invitation to present as a condition of receiving the research grant, and, as requested, traveled to Entity H's offices.   Following the presentation, a principal of Entity H introduced himself to MabVax's CEO and shared disarmingly personal details about a family loss from childhood cancer.  Entity H's principal told MabVax that he was so impressed with its clinical program that Entity H was interested in investing in the Company, and even taking it public.

48.     MabVax never received the research "grant" from Charity H that had lured it into Entity H's New York offices.[4]  Entity H, however, promptly followed up with MabVax about its enthusiasm for the Company and its potential to go public.  Soon thereafter, Entity H proposed a $6 million investment in MabVax, to be made in two tranches of $3 million.  The first tranche would be made up-front because MabVax desperately needed financing, with a second tranche of $3 million to come several months later *only if MabVax became a public company* (which Entity H committed to assisting, which was Defendants' goal in identifying MabVax in the first instance).  Entity H's financing proposal was essentially non-negotiable.

49.     As the first tranche of the financing was closing and MabVax was preparing to distribute shares, Entity H sent an investor list that, to MabVax's surprise, revealed Entity H was *not* the only investor.  Roughly $1 million was being invested by HSCI—a company that MabVax had never heard of.  Even that belated disclosure was dishonest; Entity H falsely reported that Stetson was the sole managing member of HSCI, even though Honig (whom MabVax also had never heard of) owned the great majority of HSCI and actually directed and controlled HSCI's investment decisions.  At no time did Entity H disclose its many years of collaboration with Honig, Stetson, and other Defendants.

50.     Soon thereafter, Entity H told MabVax that it had found a public shell company that MabVax should enter into a reverse merger with—thereby going public.  This was the shell company Honig had found—something that Entity H also did not disclose to MabVax at the time.  MabVax

---

[4] Only after the New York presentation—and the seemingly fortuitous introduction to Entity H—did MabVax learn that the terms of Charity H's purported $500,000 research "grant" were so onerous that, as if by design, it would have been economically irrational for MabVax to accept such a grant.  (Charity H's IRS filings also make clear that, in 2014, its total grants were less than $450,000, with the largest grant of $115,000, and with every grant made to a hospital or university—never to a private company like MabVax).

agreed to pursue the merger. However, just before the merger between MabVax and the public shell was finalized, Defendants and Entity H committed to make a substantial investment in the public shell knowing that, following the planned reverse merger, their investment would be in MabVax. This investment was structured without involvement of, much less fair disclosure, to MabVax, using nominee or other straw holders in ways that obscured the true ownership of the shell that MabVax was acquiring. On information and belief, and according to the SEC Action, the undisclosed Defendants who invested in the shell, and thus in MabVax, included Brauser and Groussman and their related entities. At the same time, Entity H further burdened the shell company with a "Consent Right" whereby Entity H could block, for any reason or no reason at all, many kinds of transactions, including the issuance of additional shares, any change of control, and other significant corporate actions. MabVax closed the reverse merger on July 8, 2014, thereby becoming subject to obligations to Defendants whom it never knew existed, and also subject to the Consent Right.

51.     As MabVax was preparing to go public, Entity H scheduled a call with MabVax's CEO ostensibly to discuss the investor relations and public relations efforts necessary as the Company matured. When MabVax's CEO joined the call, however, he was surprised that both Stetson and Honig were on the call, and that Entity H had essentially no role. MabVax's CEO had never heard of Honig, who shockingly announced, in words or substance: "I'm the owner of your company. You better do what I tell you to do." Honig did not, however, disclose his relationship with Entity H, his control over HSCI, or how it was that he claimed to "own" MabVax. Still more surprising to MabVax's CEO was Entity H's officers' irrelevance during the call, and their deference to Stetson and Honig as if this was all known to them, and normal.

## DEFENDANTS TIGHTEN THEIR GRIP ON MABVAX THROUGH FURTHER FRAUD, MANIPULATION, AND DECEIT

52.     Following the reverse merger, MabVax looked for additional investors in the Company without success. Although Entity H had held itself out as a respected investor, MabVax later came to learn that Entity H, in fact, had a bad reputation for the manner in which it structured its investments and approached investee companies. In short, Entity H's large position in MabVax—and the terms of that position—was scaring away other investors.

-12-

53.     In early 2015, MabVax began to negotiate with Entity H to buy out Entity H's position in MabVax.  Entity H, however, would not agree to reasonable terms, asking for a good deal more than it had invested to be bought out.  At the time, that made no sense to MabVax.  Entity H, however, was continuing to work as an undisclosed collaborator with Defendants.

54.     Once MabVax came to its bewildering impasse with Entity H, Stetson called MabVax, inquiring about the progress of the Company.  MabVax explained to Stetson its predicament: the structure of the Entity H investment made MabVax a difficult and unattractive investment target. Stetson expressed sympathy for MabVax and volunteered that he might be able to arrange a buyout of Entity H, as well as subsequent financing for the Company.  These would become the Series D and E rounds of financing.  At that time, this call appeared to MabVax to be nothing more than the call of an interested investor.  Of course, it was all orchestrated by Honig, out of MabVax's view.  Honig sent a March 5, 2015 email to Stetson, Brauser, and Frost saying that the buyout and follow-on financing were a "real good opportunity" that would allow them to "make $35 million conservatively in 4 months and our money out [in] 4 weeks. . . . I will trade out of it for us."

55.     Stetson arranged to meet with MabVax on March 9, 2015 at the Marriott Laguna Cliffs in Dana Point, California to discuss what he was pitching as an arms-length buyout of Entity H's position in MabVax.  MabVax and Stetson reached a rough agreement on proposed terms at that meeting.  Stetson continued to express support for MabVax without ever disclosing that, in fact, he and other Defendants were collaborating with Entity H all along.

56.     Stetson brought Kesner with him, introducing Kesner to MabVax, and recommending that MabVax hire Kesner to advise MabVax on the preparation and filing of its SEC filings, and on related corporate matters.   Stetson and Kesner, and later Honig, told MabVax that Kesner had exceptionally significant experience representing companies like MabVax before the SEC and in fact had practiced at the SEC for a period of time.

57.     After the meeting, Stetson sent MabVax a March 9, 2015 email further pitching the deal.  Stetson stated that Frost would be investing, saying that *"[t]he following of Dr. Frost is worth its weight [in] gold."*  Stetson justified the proposed highly dilutive financing terms that were so unfavorable to MabVax, and favorable to the Series D and E investors, as irrelevant because Frost's

-13-

involvement would propel MabVax to great success.  Stetson argued that "[t]he cost basis of Dr. Frost is irrelevant . . . .  I anticipate that with Frost and Barry's following that the stock will trade up on announcement and with strong shareholders the stock will only increase as MabVax continues to deliver results."  Stetson also sent MabVax a spreadsheet with the terms under which he and other Defendants would exchange the Entity H shares they would buy for Series D preferred shares of MabVax stock, and make a follow-on investment in the Series E round of financing consisting of common stock and Series E preferred shares.

58.     Honig, on behalf of Defendants, insisted that these Series D and E preferred shares be convertible into common shares, but with beneficial ownership "blocker" provisions.  Pursuant to those provisions, MabVax was prohibited from converting any holder's preferred shares if doing so would give that holder more than 4.99% voting control of the total outstanding shares.  Defendants, and now Kesner, assured MabVax that these blockers would keep everything "kosher," serving as a sort of "firewall" that would operate to keep any investor from obtaining over 4.99% voting control in MabVax, thereby essentially obviating the need for Section 13(d) reporting.  Defendants and Kesner knew, or were reckless in not knowing, that such statements would be viewed by a federal regulator as false.  Indeed, Defendants would ultimately require MabVax to retain Kesner and Sichenzia—the law firm where Kesner worked—so as to conceal their illicit and undisclosed group trading under the auspices of lawful (again, "kosher") transactional structuring—unbeknownst to MabVax.

59.     On March 13, 2015, MabVax agreed to a term sheet, sent by Stetson on behalf of the still-undisclosed investor group, *explicitly requiring* MabVax to "engage the firm with which Harvey Kesner, Esq. is associated, as Company counsel (the 'Firm') for corporate and [*sic*] securities for a minimum of 12 months period following closing."  MabVax was assured that Sichenzia and Kesner were so expert in the securities laws and transactional practice that they would better serve the Company than other counsel.  Accordingly, MabVax agreed to retain Sichenzia and Kesner.  At the time of the retention, MabVax had no reason to believe that Sichenzia and its lawyers would act in the interests of anyone other than MabVax.

60.     Defendants' investor group bought out Entity H's notes and, in late March 2015, pursuant to exchange agreements with MabVax, exchanged those notes for Series D convertible

-14-

preferred shares on terms that were very favorable to those investors. Southern Biotech was one of the investors participating in the exchange. The exchange agreement between MabVax and Southern Biotech granted a Consent Right to Southern Biotech, pursuant to which MabVax was required to obtain Honig's permission, as president of Southern Biotech, before the Company could raise additional money (such as any equity or debt financing).

61.     Next, the Series E financing closed April 6, 2015, and also included terms very favorable to Series E investors. Honig and his associates managed the Frost, FGIT, and OPKO investments through the Series E financing. For example, OPKO's investment documentation was transmitted to and from, and negotiated with, Stetson and Brauser, who spoke for Frost, FGIT, OPKO, and other participating Defendants as a group.

62.     Mere days before finalizing the Series E financing, on or about April 2, 2015, Honig, Stetson, and O'Rourke had a conference call with MabVax's CEO, demanding that MabVax again sweeten the deal, this time by:

a.     Providing a number of restricted stock units to Jane Hsiao, the Vice-Chairman of OPKO;[5]

b.     Reducing its board of directors from seven members to five members selected by Defendants, including two new board members;

c.     Providing a grant of 200,000 shares of common stock to Rubin for "consulting services" to be rendered based on his industry experience as the general counsel, executive vice president and director of Frost's companies (OPKO and Ivax Pharmaceuticals, Inc. ("Ivax")).

d.     Providing a grant of 500,000 shares of common stock to DMCG—an investor relations firm—pursuant to a consulting agreement. DMCG is run by Prag, who often worked with Defendants in connection with companies they "invested" in.

63.     MabVax refused to accept Defendants' request to entirely reconstitute its board of directors. However, following negotiations that involved Defendants Honig, Stetson, and O'Rourke, MabVax agreed to support the appointment of two new board members, one to be appointed

---

[5] Although undisclosed to MabVax, Dr. Hsiao also served on the Board of Directors of another company (CoCrystal Pharma, Inc.) that is the subject of the SEC Action, and in which Honig, Frost, Brauser, Stetson, Groussman, O'Rourke, and Alpha invested.

-15-

immediately, and another who was acceptable to OPKO (and therefore its leader, Frost) to be chosen

in the coming weeks.   Before Honig agreed to this, in an April 3, 2015 email, Stetson sought

reassurance from Kesner—who by that time had been retained as *MabVax's counsel* (but who, as

noted, was always looking out for the interests of Defendants who installed him in that role)—asking:

"Are you comfortable that we will get control of the board with this language?"

64.   MabVax agreed to Honig's demand that it provide a grant of 200,000 shares—at the

time worth approximately $500,000—to Rubin pursuant to a 12-month consulting agreement under

which Rubin was to provide "advisory services in connection with corporate strategy, licensing, and

business development, and introductions to key leaders in the industry."  MabVax agreed to do so

based on Rubin's reputation as a top executive at two publicly-traded pharmaceutical companies and

alleged ability to introduce potential business partners and talent. Rubin collected his fee but never

provided any consulting services to MabVax—the consulting agreement was, in fact, a giveaway to

Rubin that Defendants imposed on MabVax.   Moreover, despite assuming a fiduciary obligation to

MabVax, at no point in time did Rubin, an attorney, advise MabVax that Defendants were acting as

an undisclosed 13D group.   Rubin's failure to disclose the true circumstances of Defendants'

conduct—and his own failure to honestly disclose his own beneficial ownership on SEC filings—is

particularly striking because he was both well aware of his legal obligations from his service as a

general counsel, officer, and director of two Frost-sponsored public companies (Ivax and OPKO), and

acutely familiar with the undisclosed group conduct insofar as he also served along with Frost as a

director of CoCrystal Pharma, Inc.—yet another small public company pillaged by Defendants Honig,

Frost, Brauser, Stetson, Groussman, O'Rourke, and Alpha.

65.   MabVax also was coerced into providing 500,000 shares—at the time, worth over

$1,000,000—to DMCG pursuant to a two-year consulting agreement under which DMCG was to

provide investor relations services. Despite becoming a consultant to MabVax, at no point in time did

DMCG or Prag advise MabVax that Defendants were acting as an undisclosed 13D group; DMCG

and Prag were acutely familiar with the undisclosed group conduct insofar as they worked with

Defendants with respect to numerous companies in which Defendants invested, including Marathon

Patent Corporation and ChromaDex Corporation.

-16-

**SICHENZIA/KESNER'S RELATIONSHIP WITH DEFENDANTS AND FALSE ADVICE AS TO THE DEFENDANTS' BENEFICIAL OWNERSHIP AND CONTROL**

66.     As noted above, Defendants required MabVax to hire the Sichenzia law firm, and its partner Kesner.  Defendants' primary purpose in doing so was to have Sichenzia and Kesner provide MabVax with misleading advice as to Defendants' beneficial ownership status, and how a regulator likely would view MabVax's reporting obligations with respect to Defendants' beneficial ownership.

67.     The federal securities laws typically require that if any person beneficially owns five percent of a class of any registered equity security of an issuer, that person must promptly disclose their beneficial ownership.  Those who act together as a group in connection with their investment in a company are treated as a "person" for purposes of this reporting requirement.  The calculation and reporting of beneficial ownership calls for an application of legal standards to known facts, an area where Sichenzia and Kesner touted their purported market-leading legal expertise on behalf of issuers like MabVax.

68.     It recently has become clear to MabVax, however, that the Defendants acted in such a way that they were a "group" under the securities laws (and on information and belief Defendants, Sichenzia, and Kesner all knew), including, but not limited to the following facts and circumstances:

a.     investing together in dozens of companies;

b.     coordinating amongst each other the amounts each will invest in those companies;

c.     consulting with one another, or with other group members, about recommendations they will together give, or demands they together will make, to the management of the companies in which they invest;

d.     including each other, and/or other group members, on their communications with the companies in which they invest;

e.     installing certain of the Defendants, or other group members, as directors or officers or counsel in the companies in which they invest; and

f.     working together to coordinate meetings and introductions between the companies in which they invest and third parties—such as institutional investors, investor relations

-17-

firms, and potential strategic transaction partners—and often requiring investee companies to retain their selected advisors.

69.     Instead, Defendants, Sichenzia, and Kesner, actively concealed their group status from MabVax.

70.     Defendants' practices and inter-relationships as a group were clear to Sichenzia and Kesner—who had a longstanding attorney-client and business relationship with Honig, Stetson, Brauser, and other Defendants.  Indeed, Kesner only recently has admitted to MabVax that Sichenzia and Kesner have worked on numerous transactions with Defendants during their long relationship— at least five transactions per year.  In fact, since 2009, Defendants have inserted Kesner as counsel to at *least 22 other companies* in which Honig, Stetson, and other Defendants have "invested."  This is why the SEC characterized Defendants' exploitation of MabVax and other vulnerable companies, over many years and for such extraordinary profit, as "brazen."

71.     Not only do Defendants use Kesner to facilitate and conceal their undisclosed group activities, Kesner *is himself part of Defendants' investor group*.  Through a variety of opaque entities he manages (and upon information and belief holds voting and dispositive power over), Kesner has invested in at least 16 companies alongside Honig and various other Defendants.[6]

72.     Despite the fact that Kesner—who has worked in the field of securities law for over 30 years—had knowledge of Defendants' practices and inter-relationships, at Defendants' behest, he concealed from MabVax the significant risk that the Defendants would be deemed a "group" under the securities laws.  To the contrary, Sichenzia and Kesner, as undisclosed collaborators with Defendants, repeatedly advised MabVax that Defendants were *not* a group for purposes of the securities laws, and they made sure that the Company's public filings disaggregated Defendants' holdings as if they were not a group.  This was not an isolated mistake.  Sichenzia, primarily through

[6] These include, without limitation: Marathon Patent Group Inc. (f/k/a American Strategic Minerals Corp); Riot Blockchain Inc. (f/k/a Bioptix, Inc., f/k/a Venaxis, Inc.); Majesco Entertainment Co. (n/k/a PolarityTE Inc.); Orbital Tracking Corp. (in which Sichenzia and Kesner both invested); Viveve Medical, Inc.; Spiral Energy Tech., Inc. (n/k/a Exactus, Inc.); BTCS Inc. (f/k/a Bitcoin Shop, Inc.) (in which Sichenzia and Kesner both invested); Cell Source, Inc. (in which Sichenzia was an investor but Kesner does not appear to have invested individually); Pershing Gold Corporation (in which Sichenzia and Kesner both invested); AV Therapeutics, Inc.; Spherix Incorporated (a company for which Kesner served as CEO and a director, while simultaneously remaining a partner at Sichenzia); Northern Wind Energy Corp. (f/k/a Icarus Wind Energy, Inc.); Document Security Systems, Inc.; Passport Potash Inc.; MusclePharm Corporation; and Bullfrog Gold Corp (in which Sichenzia was an investor but Kesner does not appear to have invested individually).

-18-

Kesner, reviewed, edited, and approved literally dozens of SEC filings over three years—many reporting Defendants' beneficial ownership and outstanding share counts—without even once suggesting there was any risk that Defendants could be considered a group, or that it would be in MabVax's interest to aggregate Defendants' individual holdings for purposes of beneficial ownership reporting in these filings. Indeed, in response to an August 18, 2015 inquiry from MabVax about potential affiliations amongst GRQ, Grander, Brauser, Honig, Stetson, and others, Sichenzia lied, saying that "Barry [Honig] is only affiliated with the GRQ entities," and that Honig was "separate" from Grander, Brauser, and Stetson.

### DEFENDANTS' APRIL 2015 "PUMP AND DUMP"

73.     One of the goals of the March and April 2015 private placement financings, as Defendants knew, was to generate market interest and boost trading volume in MabVax stock in preparation for a planned stock promotion. On April 3, 2015, O'Rourke, acting at Honig's direction and with Honig's and Brauser's input, circulated a press release touting that Frost, OPKO, and FGIT had invested in MabVax, emphasizing Frost's reputation among retail investors for successfully backing pharmaceutical companies.

74.     Honig, with the knowledge of Brauser and Stetson, then directed O'Rourke to write a fraudulent promotional article under the pseudonym "Wall Street Advisors" on the Seeking Alpha website on April 8, 2015 at 11:13 a.m. MabVax was not aware of this, nor was it aware of the true identity of "Wall Street Advisors." The article, entitled "OPKO Spots Another Overlooked Opportunity in MabVax Therapeutics," highlighted OPKO's and Frost's investment in MabVax, and was designed to inspire Frost's retail investor devotees to follow his lead and buy MabVax stock. Despite his involvement in facilitating the MabVax financing and his extensive business relationships with Honig, Brauser, Frost, and Stetson, O'Rourke not only concealed his true name in the article but also falsely claimed that "[t]he author has no business relationship with MabVax." He also knowingly and falsely claimed that he was "not receiving compensation for [writing the article]."

75.     Shortly before publications of O'Rourke's false Seeking Alpha article, ATG and O'Rourke engaged in early trading of MabVax shares on April 8, 2015 with the intention of creating a false appearance of market interest in the stock. That trading included at least one matched trade,

-19-

COMPLAINT FOR DAMAGES                                        CASE NO.:

1   this time involving Groussman's entity, Melechdavid, submitting the buy order and ATG submitting

2   the sell order for the same price at 9:38 a.m.  Again, MabVax had no knowledge of these fraudulent

3   trading activities.  The fraudulent "pump" campaign was successful.  The trading volume of MabVax

4   shares rose almost 7,500% from 8,833 shares on April 2, 2015 to 667,454 shares on April 6, 2015, and

5   spiked even higher to 858,709 shares on April 9, 2015.  MabVax's share price went from a closing

6   price of $1.91 on April 1, 2015 to a closing price of $4.30 on April 9, 2015.

7        76.   After peaking on April 10, 2015, MabVax's stock began to rapidly decline, falling 50%

8   to around $2.00 per share by June 30, 2015, as Defendants—acting pursuant to their illicit agreement

9   to acquire, hold, vote and/or dispose of their MabVax shares in concert—"dumped" their shares into

10   the market from April 6 to June 30, 2015 for total proceeds of over $5.5 million, as detailed below:

| Defendants' Pump and Dump Proceeds: April 1, 2015 – June 30, 2015 | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 4/13 – 6/30 | (576,400) | $1,600,826.76 |
| Stetson and Honig (through HSCI) | 4/6 – 6/30 | (1,080,379) | $3,607,248.91 |
| O'Rourke and ATG | 4/8 – 6/30 | (30,064) | $69,774.51 |
| Groussman (through Melechdavid) | 4/6 – 6/23 | (99,616) | $342,984.59 |
| Total | | (1,786,459) | $5,620,804.77 |

### DEFENDANTS' JULY 2015 "PUMP AND DUMP"

77.   In June 2015, when the market for MabVax shares had cooled from over $4 per share

to closing prices hovering just above $2 per share, O'Rourke recruited Ford to publish another

MabVax tout on Ford's blog.  On July 1, 2015, Ford published an article entitled "MabVax: Near-

Term Catalysts Could Push Shares from $2 to over $5."  The article contained materially false

statements, including that a licensing deal was imminent, when it was not, and that there were near-

term therapy development events that could take the share price to $5, when in fact, as Defendants

knew, clinical trials were only in early stages.  Although O'Rourke requested Ford write the article,

and Honig compensated Ford for writing the article, Ford did not disclose that he had been paid in the

article, and none of Defendants ever disclosed to MabVax that they were operating in concert to

fraudulently promote the Company's stock.

-20-

78.     Once again, the "pump" worked just as Defendants intended.  Defendants' fraudulent, purchased "research" increased MabVax trading volume from 227,182 shares on June 30, 2015 to 798,213 shares on July 2, 2015.  Likewise, MabVax's share price went from a closing price of $2.32 on June 30, 2015 to $2.71 on July 2, 2015.  Pursuant to their agreement to acquire, hold, vote and/or dispose of their shares in concert, Honig and his affiliates sold shares into the market from July 1 to December 31, 2015 for proceeds of over $2.7 million, as detailed below:

| Defendants' Pump and Dump Proceeds: July 1, 2015 – December 31, 2015 | | | |
|---|---|---|---|
| Defendants | Trade Dates (2015) | Net Quantity Sold | Proceeds |
| Brauser | 7/1 – 10/7 | (363,050) | $749,025.45 |
| Stetson and Honig (through HSCI) | 7/1 – 12/7 | (682,539) | $1,525,588.49 |
| O'Rourke and ATG | 7/1 – 12/31 | (179,690) | $235,253.20 |
| Groussman (through Melechdavid) | 7/15 – 12/18 | (212,034) | $234,250.96 |
| Total | | (1,437,313) | $2,753,118.10 |

## DEFENDANTS USE KESNER TO ILLICITLY PRESERVE THEIR "CONSENT RIGHT"— AND THEIR STRANGLEHOLD ON MABVAX

79.     Defendants' misconduct and exploitation of MabVax also extended to the so-called "Consent Right" held by one of the Defendants from March 2015 onward, pursuant to which MabVax was required to obtain the Consent Right holder's permission before it could raise additional money (such as any equity or debt financing).

80.     The Consent Right gave Defendants the necessary leverage to extract a wide range of demands from MabVax because: (1) MabVax is a clinical-stage biotechnology company that relies on outside financing; and (2) permission under the Consent Right could be withheld at the whim of the Defendants or provided only if MabVax agreed to still other additional "conditions" in exchange for permission.

81.     Indeed, by leveraging the Consent Right, Defendants forced MabVax to issue to them and to other members of their investor group free "incentive" stock that since 2015 was worth more than $8,300,000 at the time of issuance.  Defendants also required MabVax to hire vendors handpicked and controlled by Defendants.  Defendants also knew that, by refusing to grant permission under the Consent Right, or by simply threatening to do so, they could block investment from outside sources,

-21-

COMPLAINT FOR DAMAGES                                      CASE NO.:

including—as outlined below—critically-needed financing through a reputable investment bank in or about July 2017.  Through the Consent Right, Defendants could keep MabVax dependent on them and their affiliates for investments—which they required be provided on terms that were extremely favorable to them.

82.     For the same reasons, advice regarding the Consent Right was fundamental to Sichenzia's and Kesner's attorney-client relationship with MabVax.  Sichenzia represented MabVax with respect to many transactions for which the Consent Right was negotiated and triggered, and was responsible for documenting and reporting the Consent Right in many public filings and transactional documents.  MabVax reasonably expected Sichenzia and Kesner to provide loyal and competent legal advice with respect to the Consent Right, and to safeguard the Company from Defendants abusing the Right.  Little did MabVax know that Sichenzia and Kesner were simply another means by which Defendants manipulated and controlled the Company.  Sichenzia and Kesner, acting on behalf of Defendants, abused their position of trust, and subordinated MabVax's interests to Defendants', just as Defendants had them do with other victimized issuers on whom Defendants foisted Sichenzia and Kesner, such as Riot Blockchain, Inc. and Towerstream Corporation.

83.     Sichenzia and Kesner never once advised MabVax that counsel's participation with the other Defendants' investor group made the lawyers and all Defendants the beneficiaries of the Consent Right.  Nor did Sichenzia or Kesner ever disclose to MabVax why the Consent Right was held in the names of various Defendants (passing from Southern Biotech to HSCI), much less that MabVax had the right to negotiate with Defendants for greater transparency in how the Consent Right was held and, ultimately, for greater limitations on its use.  In fact, Sichenzia and Kesner never even informed MabVax that, in practice, the facts and circumstances of the ownership and use of the Consent Right could themselves create questions about the calculation and reporting of Defendants' beneficial ownership.

84.     For example, for a time Southern Biotech was the designated "investor" that held the Consent Right for the benefit of the Defendants.  Although never disclosed to MabVax at the time, Southern Biotech served no substantial business or economic purpose—other than to serve a straw holder for the "Consent Right"—i.e., the "control right"—over MabVax that none of the Defendants

-22-

wanted to hold in their actual names as to do so would risk exposing the concealed group.  Ultimately, MabVax came to learn that Honig served as Southern Biotech's president, and held voting and dispositive power over it.  Very recently, MabVax has learned—from reviewing files maintained by Sichenzia—that still other Defendants had a stake in or were involved in Southern Biotech transactions, including Stetson, Frost, and Brauser in addition to Honig.  Yet neither Defendants, nor Sichenzia and Kesner, ever once suggested that the oblique relationships between and among Southern Biotech, Honig, and other Defendants itself raised questions about whether they were conducting themselves in a manner harmful to MabVax and that required public disclosure under Section 13 of the Exchange Act.  Simply put, Southern Biotech was a sham designed to camouflage the illicit conduct of those who, like Frost, Stetson, Brauser, and Honig, make a living by avoiding mandatory disclosure under the securities laws.

85.     Defendants' use of Southern Biotech, Sichenzia, and Kesner in connection with the Consent Right is further demonstrated by their conduct in November 2015 through January 2016, when MabVax was negotiating a loan that required permission from Southern Biotech (the then-designated official holder of the Consent Right).  Sichenzia was responsible for representing MabVax's interests and, in fact, was preparing the consent documents that it advised MabVax needed to obtain, including from Honig.

86.     As the financing was being negotiated, during the first week of December 2015, MabVax's leadership team learned that Southern Biotech had (fortuitously) transferred certain shares that it was required to hold in order to maintain the Consent Right.  MabVax urgently emailed Sichenzia, so counsel could confirm that MabVax was finally free of the onerous Consent Right and advise the Company about how to proceed.  Although implicit in *all* confidential communications with its counsel, MabVax explicitly instructed counsel to avoid alerting Southern Biotech: "please hold back sending the consent to Southern Biotech[.]"  For obvious reasons, MabVax did not want to prematurely alert the Defendants that Honig had inadvertently terminated their Consent Right—and thus lost their significant leverage over MabVax.

87.     Kesner did not promptly respond to, or even acknowledge, MabVax's email.  Instead, Sichenzia and Kesner deliberately disregarded the Company's instructions.  The next day, Kesner

-23-

emailed his junior partner, Tara Guarneri-Ferrara (with the subject line MabVax): "Approval of investments[.] Does Southern Bio have or the transferees from S[outhern ]B[iotech]?" Guarneri-Ferrara replied that she would "need to see the docs by which he [*i.e.*, Honig] sold or assigned his shares[.]" "Ask for," Kesner replied—in blatant violation of MabVax's direct instructions. "OK," Guarneri-Ferrara responded. The next day, Stetson emailed Guarneri-Ferrara a copy of the relevant language.

88.     Later that day, MabVax heard directly from Honig that the shares that had been transferred out of Southern Biotech would be transferred back to Southern Biotech—thereby creating a potential argument that Southern Biotech had reestablished the Consent Right. In a second email, Honig thanked MabVax's leadership for "the heads up regarding Southern Biotech," and stated that the shares upon which the Consent Right relied were "back in[] Southern Biotech." MabVax was shocked by Honig's email. The Company had *never* discussed the issue with Honig, much less given him a "heads up" that the Consent Right had terminated to MabVax's great benefit and relief.

89.     MabVax's CEO replied to Honig saying, "I did not give you the heads up on Southern Biotech. You already realized that you had transferred all shares out of that entity. Someone else must have alerted you." As the foregoing sequence makes clear, however, it was MabVax's own counsel at Sichenzia who gave Honig the "heads up" that the Consent Right had terminated. Up to that point, the MabVax leadership team had only discussed the matter internally, with the exception of alerting Kesner and his legal team for the purposes of legal advice—and with strict instructions to *not* notify Defendants. Only *after* Honig revealed his knowledge of the Consent Right termination did Kesner address the matter with MabVax—not to help his client, but to declare that a purported undisclosed ethical conflict meant that he and his law firm could not become involved in the dispute over whether the Consent Right had been terminated.

90.     As a result of this "heads up"—and Sichenzia's violation of its client's confidence—Honig was able to re-transfer the shares into the name of Southern Biotech and thus manufacture a legal position that, by having done so, he had restored Defendants' Consent Right.

91.     Sichenzia continued to undermine MabVax with respect to this issue in January 2016. In early January, MabVax emailed Sichenzia about a new financing and what consents were needed.

-24-

In a chain of internal emails, partners at Sichenzia discussed the effect on the Consent Right of Southern Biotech's transfer of its MabVax securities. For example, Sichenzia partner David Manno expressed concern about "the SRFf [*i.e.*, Sichenzia] conflict" with respect to the issue, indicating it was not "clear as to whether the Holder's (Southern Bio) consent right in the Exchange Agreement was terminated when Southern Bio transferred its MabVax securities," and suggesting "an acknowledgment that upon the transfer the consent right terminated."

92.     Kesner promptly replied: "Here is my suggestion. Have Southern Bio itself amend the agreement with MabVax to simpl[y] terminate the Southern Bio right and provide a new approval right to Barry personally. Much simpler. *Don't discuss the below specifically with Greg [MabVax's CFO].*" (Emphasis added).[7] Another Sichenzia partner, Thomas Rose, later responded that "[i]t's fine that Barry and the company think the rights didn't transfer, but our reading of the agreement . . . is that we're not so sure. In fact, as I read, it looks like the rights transferred with the transfer of the securities." Nonetheless, pursuant to Kesner's instruction—"don't discuss the below specifically with Greg"— Sichenzia never shared their analysis of MabVax's position with MabVax. Instead of coming to the aid of their client, MabVax, they abetted the adverse position taken by Honig as the leader of Defendants intended them to do.

93.     Unable to fight a complex and protracted legal battle against the Investors with its own counsel undermining its position, MabVax agreed, on January 12, 2016, to provide Southern Biotech with a new Consent Right. It was not until years later that MabVax was finally able to escape the Consent Right. In those intervening years, Defendants used the Consent Right to MabVax's great detriment.

**DEFENDANTS FORCE MABVAX TO HIRE IRTH COMMUNICATIONS**

94.     On or about January 29, 2016, Honig introduced MabVax to IRTH, an investor relations firm in Santa Monica, California, run by Robert and Andrew Haag. Honig recommended that MabVax engage IRTH for investor relationship services. MabVax, however, was not impressed by the Haag Brothers who ran IRTH, and declined to engage them.

---

[7] As Kesner subsequently explained, "Barry [Honig] has been and continues to be representative to the transaction with MabVax. In reality."

-25-

95.     Several months later, just as MabVax was about to close a follow-on financing round with Defendants Honig, Stetson, and Brauser, Defendants required, as a condition of financing, that MabVax hire IRTH for $300,000.  MabVax remained skeptical of IRTH, and grudgingly acceded to Defendants' demands to hire the Haag Brothers, provided they comply with strict rules and were accountable to Company management and not Honig, Stetson, *et al.*  As MabVax's CEO explained in a July 31, 2016 email to IRTH, MabVax wanted "control over . . . what materials are disseminated on our behalf . . . and what is said by those we have hired to represent us."  In particular, MabVax wanted to ensure that IRTH did not leak any non-public information.

96.     Shortly thereafter, IRTH began to send MabVax invoices and, by November 10, 2016, had paid IRTH $570,979.13.

97.     By December 2016, MabVax received a regulatory request in a non-public investigation that the Company believed concerned conduct by IRTH.  Accordingly, MabVax instructed IRTH to suspend all work for the Company.  Almost immediately thereafter, MabVax received loud and vulgar requests by Honig that the Company resume using IRTH (which it refused to do).  In January 2017, MabVax issued an early termination letter to IRTH, officially terminating IRTH's services as of February 2017.

98.     IRTH provided scant to no valuable services to MabVax, certainly not fair value for the nearly $600,000 it received.  But for Defendants requiring that MabVax hire IRTH, MabVax never would have done so.  MabVax has since learned that IRTH Communications has purportedly performed investor-relations services for several companies in which Defendants invested, including U.S. Gold Corporation, which raises serious questions about whether the money MabVax was forced to pay IRTH was laundered to subsidize Defendants' "pump and dump" expenses, such as commissioning fraudulent research from Ford and others.

## DEFENDANTS BLOCK LEGITIMATE FINANCING IN 2017

99.     In the summer of 2017 MabVax began working with H.C. Wainwright & Co., an investment bank, in an effort to run an additional round of financing with investors other than Defendants and their affiliates.

-26-

100.    A brief review of the onerous terms of the previous financing MabVax had conducted with some of Defendants serves as an example elucidating the Company's motivation to find investors other than Defendants and their affiliates.  On May 18, 2017, MabVax obtained consent from HSCI (which held the Consent Right at that time) for an additional financing of $4.1 million with Defendants and their affiliates, underwritten by Laidlaw & Co.  Numerous conditions, however, were attached to this consent.  Among other things, MabVax was required to issue 2,610,000 shares of Common Stock to (so called "Inducement Shares") to investors who had participated in a prior August 2016 financing, to spend $500,000 on "one or more investor relations services", and to again nominate a new corporate director—now subject to approval by HSCI.  (MabVax also was pressured to use Laidlaw, which it since has learned served as the underwriter and banker of choice by Defendants.)

101.    Desperate to escape such onerous terms, MabVax looked elsewhere, finding H.C. Wainwright.  Defendants, however, were determined to keep MabVax dependent upon them, and to keep other investors out.   Accordingly, in July 2017, Defendants denied consent to the H.C. Wainwright financing.  This led MabVax's CEO to lament that the financing "crashed before it got out of the starting gate."

102.    Indeed, at no point in time since they first became involved with the Company have Defendants allowed MabVax to conduct even one single equity financing with any investors other than one led by one of the Defendants, involving Defendants and their affiliates.

**DEFENDANTS FRAUDULENTLY OBTAIN MILLIONS IN ILLICIT STOCK CONVERSIONS—CASTING DOUBT OVER MABVAX'S CAPITALIZATION TABLE**

103.    From the spring of 2015 until the spring of 2018, all Defendants held convertible preferred stock from MabVax, with the exception of Ford, Rubin, Andrew and Robert Haag, and IRTH (who, as noted above, benefited from their participation in the illicit group through either fully tradable common stock or cash).  Each share of convertible preferred stock, upon the request of the investor holding that share, was to be converted by MabVax into shares of common stock that could be immediately sold on the open market.  Critically, however, the convertible preferred stock was also subject to "beneficial ownership blockers" that forbade the conversion of preferred shares into

-27-

common stock if, as a result, the converting shareholder would beneficially own more than a certain percentage of MabVax (most often, 4.99%).

104.   Kesner, acting at Defendants' behest, consistently advised MabVax that the "blockers" operated as a legal barrier against any need to aggregate or report the beneficial ownership of the investors holding those shares as reaching 5%. He also advised that the blockers allowed for one investor to convert shares without regard to the ownership of MabVax stock by other investors. In effect, Kesner explained and assured, and MabVax believed and relied on Kesner, that these blockers kept the Company "safe" under the securities laws. As the Company later realized and disclosed, however, this advice was false. The blockers do not legally foreclose a determination that Defendants and their affiliates (or some of them) may be deemed as having acted as a previously undisclosed group. As discussed above, the test to determine whether investors are part of a 13D Group is a multi-factor test, and a group can exist notwithstanding the existence of beneficial ownership blockers.

105.   Contemporaneous emails—as well as Kesner's lengthy history with Defendants—demonstrate that Sichenzia not only was aware of the interchangeability of Defendants' interests, but that Defendants interposed Sichenzia and Kesner on MabVax to conceal that fact from regulators. For example, in September 2017, an examiner for Nasdaq emailed an associate at Sichenzia ("Associate One") asking for the name of "an investor" whom Associate One had stated was being issued 100,000 shares "for diligence" with respect to a particular round of financing. Associate One emailed Kesner and another Sichenzia partner, Avital Perlman, stating "The nasdaq examiner is asking for . . . Barry's name. The attached list indicates he is not an investor [in that particular financing round] though. Do you have any issue with me releasing his name?" Perlman replied, to Kesner only, "Maybe the 100,000 diligence shares should be issued to HSC[I], which did invest."

106.   Had MabVax understood that the beneficial ownership blockers did *not* foreclose a determination that Defendants were a 13D group, it would not have processed requests for conversions it received from Defendants and their affiliates. Indeed, MabVax could not have processed the conversion requests and issued common stock if Defendants were a properly disclosed 13D group, and therefore already possessed over 4.99% ownership of the Company.

-28-

COMPLAINT FOR DAMAGES                                    CASE NO.:

107.     Defendants either made no filings under sections 13(d) and/or 13(g) of the Exchange Act, or where they did make such filings, did not aggregate their ownership or indicate they were part of a 13D group.  Defendants misrepresented their beneficial ownership in connection with every purchase of stock from the Company, and misrepresented their beneficial ownership again thereafter every time they sought to convert their preferred stock into common stock. MabVax also only received the fraudulent and deceitful legal advice that Defendants put Sichenzia and Kesner in place to give. Accordingly, MabVax processed conversion requests from many Defendants who purchased convertible preferred stock issued to MabVax, as well as from other members of Defendants' investor group.  In total, MabVax issued 2,628,766 shares of common stock via preferred share conversions. These shares were worth over $22 million based on the price of the stock on the days they were issued. Neither Defendants nor their affiliates were entitled to these shares of common stock—they obtained them by fraudulently deceiving MabVax as to their status as a potential 13D group.  Had MabVax been aware of Defendants' status, it would not have issued Defendants and their affiliates $22 million in stock to which they were not entitled under the terms of the beneficial ownership blockers.

| Party Converting (including affiliated entities and family members) | Value of Common Stock Issued |
|---|---|
| Honig* | $12,604,534 |
| Brauser | $6,918,360 |
| Stetson* | $565,320 |
| Groussman | $528,957 |
| O'Rourke | $1,002,493 |
| Prag | $268,873 |
| Kesner | $53,181 |
| Others | $256,514 |
| **Total** | **$22,198,232** |

*HSCI's conversions are allocated 94% to Honig and 6% to Stetson, representing, upon information and belief, their respective ownership of HSCI, which to this day has never been fairly disclosed

108.     In processing these conversions, on each occasion, MabVax was relying on (1) the shareholder's representation that they were entitled to convert the stock as their beneficial ownership was below the blocker amount, and (2) the honesty of the shareholder's Exchange Act section 13 filings (or absence of the same).

-29-

109.    It was not until mid-2018, that the legal frailty of the "blocker" firewall was revealed. Because of this, MabVax became concerned about the validity of the 2,628,766 shares of common stock issued to its investors via preferred share conversions.  The Company also could not be certain that its previous reports regarding the number of common shares outstanding were accurate. Accordingly, MabVax had to publicly disclaim reliance on *four years* of previously filed SEC reports and financial statements and was for some time unable to file reports for 2018 as it is required to do under SEC and Nasdaq rules.  Under these circumstances, MabVax has been delisted from the Nasdaq, and has been named in putative class actions filed by certain of its shareholders.

110.    Additionally, in order to clear the cloud over its capitalization table, MabVax was forced to file a petition in the Delaware Chancery Court seeking the extraordinary relief of judicial validation of the unknown number of shares of arguably invalid common stock, and other corporate acts that also may not be valid.  While MabVax was successful in obtaining the requested relief from the Delaware Chancery Court, the action cost the Company hundreds of thousands of dollars in legal fees and expenses, all of which would have been unnecessary but for the misconduct of Defendants.

## THE SEC INVESTIGATION AND FEDERAL COURT ACTION

111.    In late January 2018, MabVax disclosed that it had received notice that the SEC was conducting an investigation relating to certain of the Company's registration statements (and amendments thereto).  The SEC issued a subpoena to MabVax on February 2, 2018.

112.    Through February and March of 2018, Defendants saw the walls closing in on them. Reporters began to contact Sichenzia and Kesner, leading one Sichenzia partner to lament "*This is going to be real bad.*"  Sichenzia's managing partner, Gregory Sichenzia, exclaimed that one article regarding Defendants' illicit activity "mentions every one of Harvey [Kesner's] clients he has ever had."  Another Sichenzia partner predicted that Gregory Sichenzia would want the firm to stop doing work for Honig "*as the noose gets tighter.*"  Despite this, Sichenzia continued to represent MabVax in connection with the SEC investigation.

113.    Sichenzia also recognized the intractable conflicts plaguing its representation of MabVax, with one partner asking "how in G-d's name can Harvey be advising [MabVax]."  Despite

-30-

acknowledging, in vivid terms, the egregious conflicts, Sichenzia did not withdraw from representation until late May 2018.

114.    Even in withdrawing, Sichenzia continued to collaborate with Defendants and violate its duties to MabVax.  A Sichenzia associate who worked on the MabVax engagement confided to a law firm colleague that he was in a professionally untenable position when asked transition questions by successor counsel.  During one instant message conversation, the associate stated, "its [*sic*] tough for me because like wtf do I say?"  He then acknowledged that "i can sell the investors down the river." Neither the Sichenzia associate, nor anyone else at that law firm, ever disclosed those true facts to MabVax (*i.e.*, their client).

115.    Kesner violated MabVax's client confidences at least one more time during the transition to successor counsel.  On information and belief, he alerted Honig and Brauser of a sensitive and confidential MabVax meeting *within ninety (90) minutes* after it concluded.

116.    On September 7, 2018, the SEC filed suit against many of the Defendants, including: Honig, Brauser, Stetson, O'Rourke, Groussman, Frost, Ford, Alpha, ATG, FGIT, GRQ, HSCI, Grander, Melechdavid, OPKO, and Southern Biotech. *See Securities and Exchange Commission v. Honig, et al.*, 1:18-cv-08175 (S.D.N.Y.).[8] The SEC complaint alleges that Defendants engaged in "three highly profitable 'pump-and-dump' schemes," that "Honig was the primary strategist, calling upon other Defendants to buy or sell stock, arrange for the issuance of shares, negotiate transactions, or engage in promotional activity" and that "once Honig and his associates had secured substantial ownership of the issuer, they acted as an undisclosed control group[.]"

### FIRST CAUSE OF ACTION
**(Market Manipulation in violation of Cal. Corp. Code § 25400 against all Defendants)**

117.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

---

[8] In an Amended Complaint filed March 8, 2019, the SEC dropped as defendants Groussman, Melechdavid, Alpha, Frost, FGIT, and OPKO, after the Court entered judgment against them, and Southern Biotech, which has been dissolved.

-31-

118.   By virtue of the allegations set forth above, Defendants violated California Corporations Code Sections 25400(a) and (b) *et seq.* Defendants' violations were committed either directly or indirectly within California.

119.   Defendants knew that they were effecting the purchase or sale of MabVax stock, arranging for the issuance of shares, negotiating transactions, or engaging in promotional activity. Defendants acted with the intent and thereby did create a false or misleading appearance with respect to the market for MabVax securities, among other things, in violation of Section 25400(a).

120.   Defendants effected repeated transactions in MabVax securities to create actual or apparent active trading in MabVax, with the knowledge that their actions would affect the stock, including its price and transactions by others, among other things, in violation of Section 25400(b).

121.   As a proximate result of Defendants' conduct occurring in California with regard to MabVax, the Company's stock was manipulated and Plaintiff was injured.

122.   Pursuant to the provisions of California Corporations Code 25500, Plaintiff is entitled to, and should be awarded, damages against Defendants for unlawful manipulation of MabVax stock.

123.   Defendants violated Section 25400 and/or willfully, directly, and materially participated in violating Section 25400 by, for example: (a) effecting transactions in MabVax securities with the intention of creating a false and misleading appearance with respect to the market for MabVax securities; (b) effecting transactions in MabVax securities to create the actuality or appearance of active trading in MabVax securities or to affect the price of MabVax securities; and/or (c) knowingly manipulating transactions in MabVax securities.

124.   Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

-32-

## SECOND CAUSE OF ACTION
**(Unlawful Business Practices in violation of Cal. Bus. & Prof. Code § 17200 against all Defendants)**

125.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

126.    Defendants engaged in unlawful business practices in violation of the Unfair Competition Law by violating the Corporate Securities Law of 1968, Cal. Corp. Code § 25400, as alleged above.  Defendants also engaged in unlawful business practices in violation of the Unfair Competition Law by committing fraud and deceit, fraudulent concealment, constructive fraud, and negligent misrepresentation, as alleged below.

127.    Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

## THIRD CAUSE OF ACTION
**(Fraud and Deceit in violation of Cal. Civ. Code §§ 1709 and 1710 and Common Law against all Defendants)**

128.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

129.    Defendants made false and misleading statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  These material misrepresentations and omissions include the topics described above in paragraphs 45 – 116.

130.    Defendants knew their representations were untrue or made such representations with reckless indifference to the truth or in a manner not warranted by the information known to Defendants.

131.    Defendants purposefully made these misrepresentations to induce reliance by Plaintiff, *e.g.*, inducing Plaintiff to issue more than 2.6 million shares of common stock (worth roughly $22 million at the time) in connection with preferred stock conversions that the Company would have been

-33-

prohibited from issuing had the true facts been disclosed, and inducing Plaintiff to issue shares of preferred stock (worth roughly $8.3 million at the time) as "inducement shares" in connection with new financings.

132.   Plaintiff was unaware of, and reasonably and justifiably relied upon, Defendants' material misrepresentations in issuing securities, remaining invested in MabVax securities, and foregoing other potential investment opportunities due to Defendants' actions.

133.   Plaintiff was damaged as a direct, proximate, and foreseeable result of the willful and intentional misconduct of Defendants.

134.   Defendants' willful and intentional misconduct, in disregard of MabVax's rights and business, justifies the awarding of punitive damages to MabVax.

135.   Defendants' intentional conduct has caused and continues to cause damage to Plaintiff.

136.   Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

## FOURTH CAUSE OF ACTION
### (Fraudulent Concealment in Violation of Cal. Civ. Code § 1710 and Common Law against all Defendants)

137.   Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

138.   Defendants deliberately concealed material information, including with respect to the topics described above in paragraphs 45 – 116.

139.   Defendants made partial representations and concealed material facts, and thus had a duty to fully disclose facts in order to prevent the statements they actually made from being misleading.

140.   Defendants Rubin, Prag, Robert Haag, Andrew Haag, DMCG, and IRTH, as agents of MabVax, owed a duty to Plaintiff, and had a duty to refrain from any act that breached the trust reposed in them.

-34-

141.    Defendants had exclusive knowledge of the concealed material facts and Plaintiff did not know, and could not reasonably be expected to know, of these facts.

142.    Defendants knew or had reason to know that the information they concealed was material, but they continued to purposefully and actively conceal material information to induce Plaintiff's reliance.

143.    Plaintiff reasonably and justifiably relied upon Defendants' material misstatements and omissions, issued securities (including conversion stock and inducement shares), forewent other potential investment opportunities, and hired and retained the services of Defendants Rubin, Prag, Robert Haag, Andrew Haag, DMCG, and IRTH, due to Defendants' actions.   Defendants' concealment was a substantial factor in causing harm to Plaintiff.

144.    Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

**FIFTH CAUSE OF ACTION**
**(Constructive Fraud in Violation of Cal. Civ. Code § 1573 and Common Law against all Defendants)**

145.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

146.    Defendants made statements to Plaintiff that were materially false and failed to disclose information that made other statements materially misleading, including with respect to the topics described above in paragraphs 45 – 116.  Defendants had a duty to disclose such information in order to prevent the statements they actually made from being misleading.

147.    Defendants Rubin, Prag, Robert Haag, Andrew Haag, DMCG, and IRTH, as agents of MabVax, owed a duty to Plaintiff, and had a duty to refrain from any act that breached the trust reposed in them.

148.    Defendants misled Plaintiff to its prejudice by inducing Plaintiff to issue MabVax securities, providing Defendants financial gain to their advantage.

-35-

149.    Plaintiff was reasonably and justifiably misled by relying on Defendants' material misrepresentations and omissions.

150.    As a direct and proximate result of Defendants' misleading statements, Plaintiff was damaged.

151.    Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

## SIXTH CAUSE OF ACTION
### (Negligent Misrepresentation in Violation of Cal. Civ. Code § 1710 and Common Law against all Defendants)

152.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

153.    By virtue of their role as agents of MabVax, Defendants Rubin, Prag, Robert Haag, Andrew Haag, DMCG, and IRTH had a particular duty to provide accurate information about MabVax and its securities, based on Plaintiff's pecuniary interest in that information.

154.    Defendants supplied to Plaintiff false material information and made material omissions, including the information described above in paragraphs 45 – 116.

155.    Defendants had no reasonable ground for believing their representations were true when made, yet intended that Plaintiff rely on their representations in order to further Defendants' fraudulent schemes to profit from MabVax through illicit transactions.

156.    Plaintiff reasonably and justifiably relied on the false information communicated by Defendants and sustained pecuniary loss as a direct and proximate result of such reliance.

157.    Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

-36-

## SEVENTH CAUSE OF ACTION
**(Tortious Interference with Prospective Economic Advantage against all Defendants)**

158.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

159.    Defendants interfered with MabVax's ability to raise money, and in turn commercialize its cancer therapies by, among other things:

a.    obtaining and then exercising their Consent Right to veto legitimate investors and financing through legitimate investment banks;

b.    compelling the Company to spend money on vendors, including but not limited to lawyers, consultants, and investor relations professionals who, although never disclosed, were working in a manner antithetical to the interests of the Company and only for the benefit of Defendants; and

c.    causing the Company to issue roughly 26% of its common shares to themselves under false pretenses that rendered those shares invalid, and thus invalidated the Company's capitalization table and rendered false the Company's financial reports that deprived it of the listing status and wherewithal to raise further investment.

160.    Defendants' conduct has caused and continues to cause damage to MabVax.

161.    Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

## EIGHTH CAUSE OF ACTION
**(Breach of Fiduciary Duty against all Defendants)**

162.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

163.    Between April 2015 and April 2016, MabVax had an agency relationship with Rubin pursuant to a consulting agreement.

-37-

164.   Between April 2015 and January 2016, MabVax had an agency relationship with DMCG. Prag is the principle of DMCG. As such, he acted as an agent of MabVax.

165.   Between August 2016 and February 2017, MabVax had an agency relationship with IRTH pursuant to the Services Agreement between MabVax and IRTH. As principals of IRTH, Robert Haag and Andrew Haag, acting on behalf of IRTH, were agents of MabVax.

166.   As agents of MabVax, Defendants Rubin, Prag, DMCG, Andrew Haag, Robert Haag, and IRTH owed fiduciary duties to MabVax, including a duty of reasonable care, a duty of loyalty, and a duty of confidentiality.

167.   These Defendants repeatedly violated these fiduciary duties to MabVax in multiple ways, including:

a.   Despite being familiar with Defendants' inter-relationships and practices, Defendants Rubin, Prag, DMCG, Robert Haag, Andrew Haag, and IRTH failed to inform MabVax of the risk that Defendants were a 13D group.

b.   Defendants Rubin, Robert Haag, Andrew Haag, and IRTH failed to provide value for the payments they received from MabVax, instead relying on the fact that Honig mandated that MabVax hire and pay them exorbitant amounts.

168.   MabVax was damaged as a direct, proximate, and foreseeable result of the willful and intentional misconduct of Defendants. Such willful and intentional misconduct, in disregard of MabVax's rights and business, justifies the awarding of punitive damages to MabVax.

169.   Defendants' intentional conduct has caused and continues to cause damage to MabVax.

170.   Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

-38-

## NINTH CAUSE OF ACTION
### (Restitution for Unjust Enrichment against All Defendants)

171.    Plaintiff realleges and incorporates by reference the allegations contained above as if fully set forth herein.

172.    Defendants received benefits from MabVax, including shares of common stock and payment for services.

173.    These benefits are unjustly retained by Defendants where they were procured by Defendants through fraud, among other things, as alleged above.

174.    Given the collective effort of all Defendants functioning as a conspiracy whereby each meaningfully contributed to the shared and illicit objective of the others, MabVax is informed and believes that in doing the wrongful and illegal acts herein alleged, Defendants, and each of them, acted as the agents and co-conspirators of the other Defendants, acted within the course and scope of said agency, and acted with the knowledge, consent, and approval of the other Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays:

A.    That judgment be entered in favor of Plaintiff and against Defendants;

B.    That Plaintiff be awarded actual and punitive damages;

C.    That Plaintiff be awarded pre- and post-judgment interest and that the interest be awarded at the highest available rate;

D.    That Defendants be required to make full disclosure and accounting of their interests and transactions in Plaintiff's securities, directly or indirectly, whether transacting in their own names or with respect to transactions undertaken through entities, nominees or other investors;

E.    That Plaintiff recover its costs of suit and reasonable attorney's fees; and

F.    That the Court grant such other legal and equitable relief as it may deem proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues triable by a jury in the above-entitled action.

-39-

1

2   Dated:   April 8, 2019

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

BAKER BOTTS L.L.P.


By:   _____
    Jonathan A. Shapiro (SBN 257199)
    jonathan.shapiro@bakerbotts.com
    BAKER BOTTS L.L.P.
    101 California Street
    San Francisco, CA 94111
    (t) (415) 291-6200
    (f) (415) 291-6300

    Brian C. Kerr (*pro hac vice* to be filed)
    brian.kerr@bakerbotts.com
    BAKER BOTTS L.L.P.
    30 Rockefeller Plaza
    New York, NY 10112
    (t) (212) 408-2543
    (f) (212) 259-2543

    David M. Locher (*pro hac vice* to be filed)
    david.locher@bakerbotts.com
    BAKER BOTTS L.L.P.
    1299 Pennsylvania Avenue, N.W.
    Washington, DC 20004
    (t) (202) 639-7750
    (f) (202) 639-1177

    Attorneys for Plaintiff
    MABVAX THERAPEUTICS HOLDINGS, INC.

-40-

COMPLAINT FOR DAMAGES                                CASE NO.:

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Barry Honig; John Stetson; Michael Brauser; John O'Rourke III; Phillip
Frost; SEE ATTACHMENT FOR ADDITIONAL DEFENDANTS

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
MabVax Therapeutics Holdings, Inc.

<table>
<tr><td>FOR COURT USE ONLY<br>(SOLO PARA USO DE LA CORTE)</td></tr>
<tr><td>ELECTRONICALLY FILED<br>Superior Court of California,<br>County of San Diego<br><b>04/08/2019</b> at 05:20:48 PM<br>Clerk of the Superior Court<br>By Georgia Dixon-Cosby,Deputy Clerk</td></tr>
</table>

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

<table>
<tr>
<td>The name and address of the court is:<br>(El nombre y dirección de la corte es):  San Diego County Superior Court of CA<br>330 West Broadway<br>San Diego, CA 92101</td>
<td>CASE NUMBER:<br>(Número del Caso):  37-2019-00018398-CU-SL-CTL</td>
</tr>
</table>

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Jonathan A. Shapiro, Baker Botts LLP, 101 California St, Ste 3600, San Francisco, CA 94111, 415-291-6200

<table>
<tr>
<td>DATE:<br>(Fecha)  04/08/2019</td>
<td>Clerk, by<br>(Secretario)  G. Dixon-Cosby</td>
<td>, Deputy<br>(Adjunto)</td>
</tr>
</table>

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

**NOTICE TO THE PERSON SERVED:** You are served

[SEAL]

1. ☑ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*

   under: ☐ CCP 416.10 (corporation)        ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)

          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

SUMMONS

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

# ATTACHMENT TO

# SUMMONS

**NOTICE TO DEFENDANT:** (*continued*)

Mark Groussman; Steven Rubin; John H. Ford; Robert Prag; Robert Haag; Andrew Haag; GRQ Consultants, Inc.; GRQ Consultants, Inc. 401K; GRQ Consultants, Inc. Roth 401K FBO Barry Honig; GRQ Consultants, Inc. Roth 401K FBO Renee Honig; Barry and Renee Honig Charitable Foundation, Inc.; Southern Biotech, Inc.; HS Contrarian Investments, LLC; Grander Holdings, Inc.; Grander Holdings Inc. 401K; Airy Properties; 11 East Airy Street Partnership; ATG Capital, LLC; OPKO Health, Inc.; Frost Gamma Investments Trust; Melechdavid, Inc.; Melechdavid, Inc. Retirement Plan; Alpha Capital Anstalt; The Del Mar Consulting Group, Inc.; The Del Mar Consulting Group, Inc. Retirement Plan Trust; and IRTH Communications, LLC

**YOU ARE BEING SUED BY PLAINTIFF:**

MabVax Therapeutics Holdings, Inc.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS: | 330 W Broadway |
| MAILING ADDRESS: | 330 W Broadway |
| CITY AND ZIP CODE: | San Diego, CA 92101-3827 |
| BRANCH NAME: | Central |
| TELEPHONE NUMBER: | (619) 450-7065 |

| PLAINTIFF(S) / PETITIONER(S): | Mabvax Therapeutics Holdings Inc |
|---|---|

| DEFENDANT(S) / RESPONDENT(S): | BARRY HONIG et.al. |
|---|---|

MABVAX THERAPEUTICS HOLDINGS INC VS HONING [E-FILE]

| NOTICE OF CASE ASSIGNMENT AND CASE MANAGEMENT CONFERENCE on MANDATORY eFILE CASE | CASE NUMBER: 37-2019-00018398-CU-SL-CTL |
|---|---|

## CASE ASSIGNMENT

Judge: Ronald F. Frazier                             Department: C-65

**COMPLAINT/PETITION FILED:** 04/08/2019

| TYPE OF HEARING SCHEDULED | DATE | TIME | DEPT | JUDGE |
|---|---|---|---|---|
| Civil Case Management Conference | 09/20/2019 | 11:15 am | C-65 | Ronald F. Frazier |

A case management statement must be completed by counsel for all parties or self-represented litigants and timely filed with the court at least 15 days prior to the initial case management conference. (San Diego Local Rules, Division II, CRC Rule 3.725).

All counsel of record or parties in pro per shall appear at the Case Management Conference, be familiar with the case, and be fully prepared to participate effectively in the hearing, including discussions of ADR* options.

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT), THE ALTERNATIVE DISPUTE RESOLUTION (ADR) INFORMATION FORM (SDSC FORM #CIV-730), A STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (ADR) (SDSC FORM #CIV-359), AND OTHER DOCUMENTS AS SET OUT IN SDSC LOCAL RULE 2.1.5.

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

TIME STANDARDS:  The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time.  General civil cases consist of all civil cases except: small claims proceedings, civil petitions, unlawful detainer proceedings, probate, guardianship, conservatorship, juvenile, parking citation appeals, and family law proceedings.

COMPLAINTS:  Complaints and all other documents listed in SDSC Local Rule 2.1.5 must be served on all named defendants.

DEFENDANT'S APPEARANCE:  Defendant must generally appear within 30 days of service of the complaint.  (Plaintiff may stipulate to no more than 15 day extension which must be in writing and filed with the Court.) (SDSC Local Rule 2.1.6)

JURY FEES:  In order to preserve the right to a jury trial, one party for each side demanding a jury trial shall pay an advance jury fee in the amount of one hundred fifty dollars ($150) on or before the date scheduled for the initial case management conference in the action.

MANDATORY eFILE: Case assigned to mandatory eFile program per CRC 3.400-3.403 and SDSC Rule 2.4.11. All documents must be eFiled at www.onelegal.com.  Refer to General Order in re procedures regarding electronically imaged court records, electronic filing, and access to electronic court records in civil and probate cases or guidelines and procedures.

COURT REPORTERS: Court reporters are not provided by the Court in Civil cases. See policy regarding normal availability and unavailability of official court reporters at www.sdcourt.ca.gov.

*ALTERNATIVE DISPUTE RESOLUTION (ADR):  THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO TRIAL, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. PARTIES MAY FILE THE ATTACHED STIPULATION TO USE ALTERNATIVE DISPUTE RESOLUTION (SDSC FORM #CIV-359).

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jonathan A. Shapiro (SBN 257199)<br>BAKER BOTTS L.L.P.<br>101 California Street, Suite 3600<br>San Francisco, CA 94111<br>TELEPHONE NO.: (415) 291-6200     FAX NO. *(Optional):* (415) 291-6300<br>E-MAIL ADDRESS *(Optional):* jonathan.shapiro@bakerbotts.com<br>ATTORNEY FOR *(Name):* MabVax Therapeutics Holdings, Inc. v. Barry Honig, et al. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**05/14/2019** at 09:31:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: San Diego CA 92101 | |
| BRANCH NAME: Central Division | |

| PLAINTIFF/PETITIONER: MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ summons
   b. ☑ complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☑ other *(specify documents):* Stipulation to Use ADR; Notice of Case Assignment and CMC

3. a. Party served *(specify name of party as shown on documents served):*
      Phillip Frost

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:
   21 Star Island Drive, Miami Beach, FL 33139

5. I served the party *(check proper box)*
   a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date):*                    (2) at *(time):*

   b. ☐ **by substituted service.** On *(date):*           at *(time):*           I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*      from *(city):*      **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER:  MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

5.  c.  ☑   **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1)  on *(date):* April 16, 2019     (2)  from *(city):* San Francisco

    (3)  ☐  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me.  *(Attach completed* Notice and Acknowledgement of Receipt.*) (Code Civ. Proc., § 415.30.)*

    (4)  ☑   to an address outside California with return receipt requested.  (Code Civ. Proc., § 415.40.)

  d.  ☐   **by other means** *(specify means of service and authorizing code section):*

    ☐   Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

  a.  ☑   as an individual defendant.
  b.  ☐   as the person sued under the fictitious name of *(specify):*
  c.  ☐   as occupant.
  d.  ☐   On behalf of *(specify):*

    under the following Code of Civil Procedure section:

    ☐  416.10 (corporation)     ☐  415.95 (business organization, form unknown)
    ☐  416.20 (defunct corporation)     ☐  416.60 (minor)
    ☐  416.30 (joint stock company/association)     ☐  416.70 (ward or conservatee)
    ☐  416.40 (association or partnership)     ☐  416.90 (authorized person)
    ☐  416.50 (public entity)     ☐  415.46 (occupant)
                                                ☐  other:

7.  **Person who served papers**
  a.  Name:   Mary Ann Rubalcaba
  b.  Address:   Baker Botts L.L.P., 101 California Street, Suite 3600, San Francisco, CA 94111
  c.  Telephone number:  (415) 291-6200
  d.  **The fee** for service was: $ 0.00
  e.  I am:

    (1)  ☑   not a registered California process server.
    (2)  ☐   exempt from registration under Business and Professions Code section 22350(b).
    (3)  ☐   a registered California process server:
        (i)  ☐   owner  ☐  employee  ☐  independent contractor.
        (ii)  Registration No.:
        (iii)  County:

8.  ☑   **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9.  ☐   **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  April 26, 2019

| Mary Ann Rubalcaba | ► *Mary Ann Rubalcaba* |
|---|---|
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR  MARSHAL) | (SIGNATURE ) |

**SENDER: *COMPLETE THIS SECTION***

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**PHILLIP FROST**
**21 Star Island Drive**
**Miami Beach FL 33139**

9590 9402 1623 6053 0904 01

2. Article Number *(Transfer from service label)*

7016 1370 0000 0678 6826

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X ☐ Agent
☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

D. Is delivery address different from Item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☑ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jonathan A. Shapiro (SBN 257199)<br>BAKER BOTTS L.L.P.<br>101 California Street, Suite 3600<br>San Francisco, CA 94111<br>TELEPHONE NO.: (415) 291-6200     FAX NO. *(Optional):* (415) 291-6300<br>E-MAIL ADDRESS *(Optional):* jonathan.shapiro@bakerbotts.com<br>ATTORNEY FOR *(Name):* MabVax Therapeutics Holdings, Inc. v. Barry Honig, et al. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**05/14/2019** at 09:31:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF **SAN DIEGO** | |
|---|---|
| STREET ADDRESS: **330 West Broadway** | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE: **San Diego CA 92101** | |
| BRANCH NAME: **Central Division** | |

| PLAINTIFF/PETITIONER: MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.

2. I served copies of:
   a. ☑ summons
   b. ☑ complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☑ other *(specify documents):* Stipulation to Use ADR; Notice of Case Assignment and CMC

3. a. Party served *(specify name of party as shown on documents served):*
      Steven Rubin

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:
   OPKO Health, Inc., 4400 Biscayne Blvd, Miami, FL 33137

5. I served the party *(check proper box)*
   a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*                    (2) at *(time):*
   b. ☐ **by substituted service.** On *(date):*              at *(time):*              I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*          from *(city):*          **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER:  MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

5.  c.  ☑  **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1)  on *(date):* April 16, 2019    (2)  from *(city):* San Francisco

    (3)  ☐  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me.  *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4)  ☑  to an address outside California with return receipt requested.  (Code Civ. Proc., § 415.40.)

  d.  ☐  **by other means** *(specify means of service and authorizing code section):*

    ☐  Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:
  a.  ☑  as an individual defendant.
  b.  ☐  as the person sued under the fictitious name of *(specify):*
  c.  ☐  as occupant.
  d.  ☐  On behalf of *(specify):*
    under the following Code of Civil Procedure section:

|  |  |
|---|---|
| ☐  416.10 (corporation) | ☐  415.95 (business organization, form unknown) |
| ☐  416.20 (defunct corporation) | ☐  416.60 (minor) |
| ☐  416.30 (joint stock company/association) | ☐  416.70 (ward or conservatee) |
| ☐  416.40 (association or partnership) | ☐  416.90 (authorized person) |
| ☐  416.50 (public entity) | ☐  415.46 (occupant) |
|  | ☐  other: |

7.  **Person who served papers**
  a.  Name:  Mary Ann Rubalcaba
  b.  Address:  Baker Botts L.L.P., 101 California Street, Suite 3600, San Francisco, CA 94111
  c.  Telephone number:  (415) 291-6200
  d.  **The fee** for service was:  $ 0.00
  e.  I am:
    (1)  ☑  not a registered California process server.
    (2)  ☐  exempt from registration under Business and Professions Code section 22350(b).
    (3)  ☐  a registered California process server:
      (i)  ☐  owner  ☐  employee  ☐  independent contractor.
      (ii)  Registration No.:
      (iii)  County:

8.  ☑  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9.  ☐  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  May 3, 2019

| Mary Ann Rubalcaba | ▶ *Mary Ann Rubalcaba* |
|---|---|
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | (SIGNATURE ) |

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

STEVEN RUBIN
OPKO Health Inc.
4400 Biscayne Blvd
Miami FL 33137

9590 9402 1623 6053 0904 25

2. Article Number *(Transfer from service label)*

7016 1370 0000 0678 6840

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X *Timothy Rubid*   ☑ Agent
                      ☐ Addressee

B. Received by *(Printed Name)*   C. Date of Delivery

*Timothy Sheffield*   4/22/19

D. Is delivery address different from Item 1?   ☐ Yes
   If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
  Mail Restricted Delivery
  0)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053          Domestic Return Receipt

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jonathan A. Shapiro (SBN 257199)<br>BAKER BOTTS L.L.P.<br>101 California Street, Suite 3600<br>San Francisco, CA 94111<br>TELEPHONE NO.: (415) 291-6200     FAX NO. *(Optional):* (415) 291-6300<br>E-MAIL ADDRESS *(Optional):* jonathan.shapiro@bakerbotts.com<br>ATTORNEY FOR *(Name):* MabVax Therapeutics Holdings, Inc. v. Barry Honig, et al. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**05/14/2019** at 09:31:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO |
|---|
| STREET ADDRESS: 330 West Broadway |
| MAILING ADDRESS: |
| CITY AND ZIP CODE: San Diego CA 92101 |
| BRANCH NAME: Central Division |

| PLAINTIFF/PETITIONER: MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ summons
   b. ☑ complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ☑ other *(specify documents):* Stipulation to Use ADR; Notice of Case Assignment and CMC

3. a. Party served *(specify name of party as shown on documents served):*
      Frost Gamma Investments Trust

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:
   4400 Biscayne Blvd, Miami, FL 33137

5. I served the party *(check proper box)*
   a. ☐  **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):*                    (2) at *(time):*
   b. ☐  **by substituted service.** On *(date):*              at *(time):*              I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐  **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐  **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐  **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him or her of the general nature of the papers.

      (4) ☐  I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*          from *(city):*          **or** ☐ a declaration of mailing is attached.

      (5) ☐  I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

**PROOF OF SERVICE OF SUMMONS**

Code of Civil Procedure, § 417.10

| PLAINTIFF/PETITIONER: MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

5. c. ☑ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):* April 16, 2019      (2) from *(city):* San Francisco

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed Notice and Acknowledgement of Receipt.)* (Code Civ. Proc., § 415.30.)

   (4) ☑ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

  d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:
  a. ☐ as an individual defendant.
  b. ☐ as the person sued under the fictitious name of *(specify):*
  c. ☐ as occupant.
  d. ☑ On behalf of *(specify):* Frost Gamma Investments Trust
    under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☑ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
  a. Name: Mary Ann Rubalcaba
  b. Address: Baker Botts L.L.P., 101 California Street, Suite 3600, San Francisco, CA 94111
  c. Telephone number: (415) 291-6200
  d. **The fee** for service was: $ 0.00
  e. I am:
    (1) ☑ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☐ a registered California process server:
      (i) ☐ owner ☐ employee ☐ independent contractor.
      (ii) Registration No.:
      (iii) County:

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

  or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: April 26, 2019

| Mary Ann Rubalcaba | ▶ *Mary Ann Rubalcaba* |
|---|---|
| (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL) | (SIGNATURE ) |

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**FROST GAMMA INVESTMENTS TRUST**
**4400 Biscayne Blvd**
**Miami FL 33137**

9590 9402 1623 6053 0904 63

2. Article Number (Transfer from service label)

7016 1370 0000 0678 6888

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _Timothy Elliot_   ☒ Agent
☐ Addressee

B. Received by (Printed Name)   C. Date of Delivery
Timothy Sheffield   4/22/19

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053   Domestic Return Receipt

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Jonathan A. Shapiro (SBN 257199)<br>BAKER BOTTS L.L.P.<br>101 California Street, Suite 3600<br>San Francisco, CA 94111<br>TELEPHONE NO.: (415) 291-6200     FAX NO. *(Optional):* (415) 291-6300<br>E-MAIL ADDRESS *(Optional):* jonathan.shapiro@bakerbotts.com<br>ATTORNEY FOR *(Name):* MabVax Therapeutics Holdings, Inc. v. Barry Honig, et al. | **ELECTRONICALLY FILED**<br>Superior Court of California,<br>County of San Diego<br>**05/14/2019** at 09:31:00 PM<br>Clerk of the Superior Court<br>By E- Filing,Deputy Clerk |

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF   SAN DIEGO | |
|---|---|
| STREET ADDRESS:   330 West Broadway | |
| MAILING ADDRESS: | |
| CITY AND ZIP CODE:   San Diego CA 92101 | |
| BRANCH NAME:   Central Division | |

| PLAINTIFF/PETITIONER: MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT: Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

| PROOF OF SERVICE OF SUMMONS | Ref. No. or File No.: |
|---|---|

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ✔ summons
   b. ✔ complaint
   c. ✔ Alternative Dispute Resolution (ADR) package
   d. ✔ Civil Case Cover Sheet *(served in complex cases only)*
   e. ☐ cross-complaint
   f. ✔ other *(specify documents):*  Stipulation to Use ADR; Notice of Case Assignment and CMC

3. a. Party served *(specify name of party as shown on documents served):*

      OPKO Health, Inc.

   b. ✔ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

      CorpDirect Agents, Inc.

4. Address where the party was served:
   1200 South Pine Island Road, Miami, FL 33324
5. I served the party *(check proper box)*
   a. ☐ **by personal service.** I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party  (1) on *(date):*                     (2) at *(time):*
   b. ☐ **by substituted service.** On *(date):*             at *(time):*          I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him or her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him or her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., § 415.20). I mailed the documents on *(date):*          from *(city):*              **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| PLAINTIFF/PETITIONER:  MabVax Therapeutics Holdings, Inc. | CASE NUMBER: |
|---|---|
| DEFENDANT/RESPONDENT:  Barry Honig, et al. | 37-2019-00018398-CU-SL-CTL |

5.  c.  [✔]  **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1)  on *(date):* April 16, 2019    (2)  from *(city):* San Francisco

    (3)  [ ]  with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me.  *(Attach completed* Notice and Acknowledgement of Receipt.*)* (Code Civ. Proc., § 415.30.)

    (4)  [✔]  to an address outside California with return receipt requested.  (Code Civ. Proc., § 415.40.)

  d.  [ ]  **by other means** *(specify means of service and authorizing code section):*

    [ ]  Additional page describing service is attached.

6.  The "Notice to the Person Served" (on the summons) was completed as follows:

  a.  [ ]  as an individual defendant.

  b.  [ ]  as the person sued under the fictitious name of *(specify):*

  c.  [ ]  as occupant.

  d.  [✔]  On behalf of *(specify):*  OPKO Health, Inc.

    under the following Code of Civil Procedure section:

| | |
|---|---|
| [✔]  416.10 (corporation) | [ ]  415.95 (business organization, form unknown) |
| [ ]  416.20 (defunct corporation) | [ ]  416.60 (minor) |
| [ ]  416.30 (joint stock company/association) | [ ]  416.70 (ward or conservatee) |
| [ ]  416.40 (association or partnership) | [ ]  416.90 (authorized person) |
| [ ]  416.50 (public entity) | [ ]  415.46 (occupant) |
| | [ ]  other: |

7.  **Person who served papers**

  a.  Name:  Mary Ann Rubalcaba

  b.  Address:  Baker Botts L.L.P., 101 California Street, Suite 3600, San Francisco, CA 94111

  c.  Telephone number:  (415) 291-6200

  d.  **The fee** for service was: $ 0.00

  e.  I am:

    (1)  [✔]  not a registered California process server.

    (2)  [ ]  exempt from registration under Business and Professions Code section 22350(b).

    (3)  [ ]  a registered California process server:

      (i)  [ ]  owner  [ ]  employee  [ ]  independent contractor.

      (ii)  Registration No.:

      (iii)  County:

8.  [✔]  **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9.  [ ]  **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date:  May 3, 2019

Mary Ann Rubalcaba
    (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

    ▶ *Mary Ann Rubalcaba*
        (SIGNATURE )

**PROOF OF SERVICE OF SUMMONS**



**SENDER: COMPLETE THIS SECTION**

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

**OPKO HEALTH, INC.**
**c/o CORPDIRECT AGENTS, INC.**
**1200 South Pine Island Road**
**Miami FL 33324**

9590 9402 1623 6053 0904 32

2. Article Number (Transfer from service label)

7016 1370 0000 0678 6857

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
RECEIVED
X
☐ Agent
☐ Addressee

B. Received by (Printed Name)
APR 24 2019
C. Date of Delivery

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☒ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053

Domestic Return Receipt